UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE LAVERN BODRIE,

Petitioner,

v.                                          CASE NO. 08-11169
                                            HONORABLE GERALD E. ROSEN
BLAINE C. LAFLER,

Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

This matter is pending before the Court on a *pro se* habeas corpus petition challenging petitioner George Lavern Bodrie's convictions for nine counts of criminal sexual conduct (CSC). Petitioner alleges that his trial and appellate attorneys were ineffective, that the trial court erred on collateral review of his convictions, and that he is entitled to an evidentiary hearing. Respondent Blaine C. Lafler urges the Court to deny the petition on the ground that Petitioner's claims lack merit and that Petitioner failed to comply with the Court's order granting a stay in this case. The Court agrees that Petitioner's claims do not warrant habeas relief. Consequently, the petition will be denied on that basis.

## I. BACKGROUND

### A. The Facts

Petitioner was charged in Tuscola County, Michigan with one count of first-degree CSC and eight counts of second-degree CSC. The charges arose from allegations that Petitioner sexually abused his developmentally impaired stepdaughter by penetrating her vagina with his

finger, by touching her breasts and genital area, and by making her touch his penis. The incidents occurred in 2002 when the girl was fourteen years old. Petitioner was tried before a jury in Tuscola County Circuit Court where the evidence established the following facts.

<u>Teresa Bodrie</u>

Petitioner's wife, Teresa Bodrie, testified that she was living with Petitioner, her two daughters (including the complainant), and her son in the early part of 2002. Mrs. Bodrie explained that the complainant had a learning disability and was slow in understanding things due to permanent brain damage that she sustained as an infant. In July of 2002, Mrs. Bodrie's four-year-old nephew drowned in the Bodrie's swimming pool. This led to Mrs. Bodrie's hospitalization in a psychiatric ward for eight days in August of 2002. When she was released from the hospital on August 8, 2002, the complainant informed her that Petitioner had been touching her. Mrs. Bodrie then took the complainant to the state police post.

Mrs. Bodrie also testified about an incident that occurred one day in 1995 when she came home from work. Petitioner met her as she walked in the house and informed her that he had fallen asleep on a lounge chair in the living room and woken up to find the complainant touching his private area on the outside of his clothes. Petitioner stated that he later went to sleep naked in their bedroom and woke up to find the complainant touching his penis. The complainant was seven years old at the time and, according to Mrs. Bodrie, Petitioner had said they needed to get help for the complainant. Mrs. Bodrie took the complainant to List Psychological Services on the following day, and the State's protective services agency subsequently became involved. Although a criminal investigation against Petitioner resulted from the allegations, the charge was dismissed at the preliminary hearing because the prosecutor and Mrs. Bodrie thought the

2

complainant was not emotionally capable of testifying.

### The Complainant

The complainant was sixteen years old at trial.  She testified that, in 2002, she was living with Petitioner, who was her stepfather, and her mother, sister, and brother.  In March of 2002, Petitioner inserted his finger in her vagina and touched her breasts in the living room of their home while her mother was working.  Petitioner also took her hand and made her touch his penis.  In August of 2002, while her mother was in the hospital, Petitioner came in her bedroom and touched her breasts and vagina above and below her clothing.  There was a third incident where Petitioner touched her breasts and vagina above and below her clothing and made her put her hand on his penis.

The complainant stated that, initially she may have told her grandmother and aunt that nothing happened, but she later disclosed what had happened to them.  And when her mother got out of the hospital, she told her mother what Petitioner had done.  She also informed a state police officer what had happened, and she told the truth when she talked to the officer.

### Kyle Hoskins

Kyle Hoskins testified that she was employed at the State police crime lab in Bridgeport, Michigan.  She analyzed the complainant's underwear and found no evidence of semen, blood, or pubic hair.

### Joyce Rahn

The complainant's grandmother, Joyce Rahn, testified that she picked up Teresa Bodrie from the hospital in August of 2002.  On the same day, Ms. Rahn spoke with the complainant and asked her whether her father had ever touched her.   At first, the complainant said, "No."

3

But when Ms. Rahn assured the complainant that nobody was going to hurt her, the complainant informed her that her father had touched her breasts. Ms. Rahn did not suggest any particular type of touching to the complainant and she had not mentioned any body parts to the complainant prior to that time. She believed what the complainant had said and, after talking to the complainant's mother, they went to the state police post. She did not tell the complainant what to say to the police.

<u>Hilary Hare</u>

State trooper Hilary Hare testified that she spoke with the complainant at the police post on or about August 8, 2002. After Trooper Hare determined that the complainant was capable of telling the truth, the complainant told her about some sexual contact with Petitioner. Trooper Hare then contacted Petitioner and informed him of the complainant's allegations. During her interview with Petitioner, Petitioner at first said that he thought his wife and mother-in-law influenced the complainant to make up the accusations due to a pending divorce and custody dispute. But when Trooper Hare pointed out that the complainant was his stepchild and that there would be no custody dispute over her, Petitioner did not have a response.

During the interview, Trooper Hare asked Petitioner what happened when his daughters went in his bedroom during his wife's hospitalization. Petitioner responded, "As far as I know, nothing happened." Petitioner denied going into the complainant's bedroom while his wife was in the hospital, and when Trooper Hare asked him about watching a pornographic movie with the complainant, he claimed that he had found the movie alongside the road. Although the police confiscated Petitioner's computer to search for pornography, they were unable to find any evidence because the hard drive had been destroyed.

4

<u>Petitioner's Biological Daughter</u>

Petitioner's biological daughter testified for the defense that, when the state trooper asked her whether her father had touched her sister, she informed the trooper that she did not know. The biological daughter also testified that she and the complainant sometimes slept in their father's bedroom and that, when their mother was in the hospital, their father told them he wanted to get rid of their horses because the family spent a lot of money on grain and bedding. On cross-examination, the biological daughter stated that she thought her father treated her differently from the complainant and that she became suspicious when her sister began to spend a lot of time with their father. The affection they displayed toward each other did not seem right to her.

<u>Barbara Hatfield</u>

Barbara Hatfield also testified for the defense. She explained that she was Teresa Bodrie's cousin and that she went to the hospital to pick up Mrs. Bodrie on August 8, 2002. Mrs. Bodrie's mother, Joyce Rahn, was already at the hospital, and the three of them went from the hospital to pick up Mrs. Bodrie's daughters at April McQueen's house. At Ms. McQueen's house, Joyce Rahn asked the complainant what happened while Mrs. Bodrie was in the hospital. Initially, the complainant did not respond, but Ms. Rahn asked the complainant several times during an eight- to ten-minute conversation whether the complainant's father had touched her "down below." The complainant then said that, while she was sleeping on the couch, Petitioner pulled the blankets back and touched her breasts. On hearing that, Ms. Hatfield and Ms. Rahn approached Mrs. Bodrie. They subsequently went to the state police post.

<u>George Lavern Bodrie</u>

5

Petitioner testified that, after his wife's nephew drowned in late July of 2002, his marriage changed and he could not handle the financial burden of maintaining two horses. During his wife's hospitalization in August of 2002, he slept in his bedroom or on the couch in the living room. He did not know where his daughters slept because they usually went to bed later than he did, but he did tell the state trooper that the girls sometimes slept in his bedroom with him.

Petitioner also testified that, while his wife was in the hospital, he talked to his daughters about divorcing their mother. He explained to them that, if their mother did not get rid the horses, he was planning to get a divorce and he wanted to know with whom they preferred to stay. Even though the complainant was not his biological daughter, he wanted to begin making arrangements for her. He asked the girls to keep this a secret, but they told their mother about his divorce plans while she was in the hospital.

Petitioner further testified that he was responsible for disciplining his biological daughter and his two stepchildren. The children did not receive allowances, but they did receive gifts for doing a good job, and all of the children had pets. He denied treating one child better than another child, but he admitted there may have a time when one child received special attention for his or her efforts.

As for the pornographic movie in the house, Petitioner stated that his brother found it alongside the road and gave it to him. He denied watching pornography on his computer while the children were present, and he denied doing anything inappropriate to the complainant. He claimed that the allegations against him were untrue, that he never touched the complainant's breasts or vagina, and that he did not insert his finger in the complainant's vagina. He also said

6

that he never made the complainant touch his penis and that he did not think she was being truthful.

Petitioner also denied trying to damage his computer. He maintained that the computer was working when he last used it and that he had no reason to tamper with it because the police had not yet contacted him then, nor talked to him about the computer.

Regarding the 1995 incidents, Petitioner testified that the complainant had been shifting in the chair and had put her hand on his private part to support her weight as she moved around. He did not consider the physical contact with his private part to be sexual. Later that same night, however, he woke up nude in his bedroom and discovered the complainant touching his penis with her hand. He did not know whether he ejaculated, but he had an erection, and his belly was wet.

On October 8, 2003, the jury found Petitioner guilty, as charged, of one count of first-degree CSC, Mich. Comp. Laws § 750.520b(1)(b)(ii) (sexual penetration of a relative who is 13, 14, or 15 years old), and eight counts of second-degree CSC, Mich. Comp. Laws § 750.520c(1)(b)(ii) (sexual contact with a relative who is 13, 14, or 15 years old). On December 8, 2003, the trial court sentenced Petitioner to a term of ten to thirty years in prison for the first-degree CSC conviction and to a concurrent term of five to fifteen years for the second-degree CSC convictions.

**B. The Post-Conviction Proceedings**

### 1. The Appeal, Habeas Petition, and State Collateral Proceedings

In an appeal of right, Petitioner asserted that the trial court erred by admitting evidence of the 1995 incidents of sexual contact between him and his stepdaughter. The Michigan Court of

7

Appeals disagreed and affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Bodrie*, No.252969 (Mich. Ct. App. Mar. 15, 2005).   On December 9, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issue. *See People v. Bodrie*, 474 Mich. 951; 706 N.W.2d 729 (2005) (table).[1]

On December 4, 2006, Petitioner filed a motion for relief from judgment in which he alleged that his trial and appellate attorneys were ineffective.  The trial court denied Petitioner's motion and his subsequent motion to extend the time to file a motion for reconsideration.

On or about December 4, 2007, Petitioner filed a motion to include supplemental materials and for further alternative relief.  The trial court denied Petitioner's motion and his motion for reconsideration.  Petitioner appealed the trial court's denial of his post-conviction motions, but the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Bodrie*, No. 284198 (Mich. Ct. App. Sept. 11, 2008) (unpublished).  On February 24, 2009, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Bodrie*, 483 Mich. 894; 760 N.W.2d 474 (2009) (table).

Meanwhile, on March 19, 2008, Petitioner filed a habeas corpus petition in this Court, and on or about March 31, 2008, he filed a second or successive motion for post-conviction relief in state court.  The habeas petition alleged that the trial court erroneously admitted evidence of other "bad acts" at trial and that Petitioner's trial and appellate attorneys were ineffective.  Petitioner asked the Court to hold his habeas petition in abeyance while he pursued

---

[1]  Justice Marilyn J. Kelly voted to grant leave to appeal to examine the viability of the rule relied on by the trial court.

8

additional remedies in state court. On March 28, 2008, the Court granted Petitioner's request for a stay and closed this case for administrative purposes. The Court conditioned its stay on Petitioner filing an amended habeas corpus petition and motion for reinstatement within ninety days of exhausting state remedies.

The state trial court subsequently held an evidentiary hearing on Petitioner's second or successive motion for relief from judgment, which purported to have new evidence that the complainant had recanted her trial testimony. The complainant was twenty years old at the time of the hearing on Petitioner's motion. She claimed that she had testified truthfully at trial and would not change her prior testimony. The trial court then denied Petitioner's motion for relief from judgment. Petitioner moved for an extension of time to file a motion for reconsideration, and because the state trial court failed to rule on his motion, he filed a complaint for superintending control. The Michigan Court of Appeals denied his complaint, and on November 22, 2010, the Michigan Supreme Court denied relief because it was not persuaded to review the question presented to it. *See Bodrie v. Tuscola Circuit Court*, 488 Mich. 948; 790 N.W.2d 684 (2010) (table).

### 2. The Amended Petition and Answer

On February 15, 2011, Petitioner moved for reinstatement of this case and for leave to file an amended habeas corpus petition. The Court granted Petitioner's motion for reinstatement, and on September 28, 2011, Respondent filed an answer to the amended petition.

The Court understands the amended petition to allege that: (I) trial counsel was ineffective for failing to (A) discover and develop impeachment evidence, (B) discover and develop evidentiary support for the asserted defense, (C) timely object to the prosecutor's

closing argument, and (D) investigate and locate an expert witness; (II) the trial court erred by denying relief from judgment where Petitioner's claims adequately set forth "cause and prejudice" for failing to raise his claims on direct appeal; (III) the trial court erred by denying relief from judgment where trial counsel failed to object to the prosecutor's argument about prior "bad acts" and where counsel failed to investigate and call witnesses in Petitioner's behalf; (IV) appellate counsel was ineffective for failing to include viable issues on appeal; (V) Petitioner is entitled to an evidentiary hearing on his ineffective-assistance-of-counsel claims; (VI) the trial court erred by denying Petitioner's motion for further alternative relief and to include supplemental material; and (VII) the trial court erred by denying Petitioner's supplemental motion to correct a typographical error or mistake.  Respondent maintains that these claims are barred by the statute of limitations because Petitioner did not return to federal court within ninety days of exhausting state remedies for his claims.  The Court has determined that Petitioner's claims lack substantive merit.  Thus, it is unnecessary to determine whether Petitioner also failed to comply with the one-year statute of limitations for habeas cases.  The Court will proceed to address Petitioner's claims, using the following standard of review.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

10

determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
       State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the
state court arrives at a conclusion opposite to that reached by [the Supreme] Court
on a question of law or if the state court decides a case differently than [the
Supreme] Court has on a set of materially indistinguishable facts. Under the
"unreasonable application" clause, a federal habeas court may grant the writ if the
state court identifies the correct governing legal principle from [the Supreme]
Court's decisions but unreasonably applies that principle to the facts of the
prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so
long as 'fairminded jurists could disagree' on the correctness of the state court's decision."
*Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664
(2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was
unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). To obtain a writ of
habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his
or her claim "was so lacking in justification that there was an error well understood and
comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at
786-87.

## III. DISCUSSION

### A. Trial Counsel

Petitioner's first and third claims allege ineffective assistance of trial counsel. The trial
court addressed this issue in its order denying Petitioner's motion for relief from judgment. The

11

court stated that trial counsel did not provide ineffective assistance of counsel by choosing not to present evidence or witnesses that could have attacked the victim's credibility. The court also stated that Petitioner had failed to establish that trial counsel's representation fell below an objective standard of reasonableness and that counsel's representation prejudiced him so as to deprive him of a fair trial.[2]

To prevail on his ineffective-assistance-of-counsel claims, Petitioner must demonstrate that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694 . "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693). "The standards created by *Strickland* and §

---

[2] The trial court also stated that Petitioner could have raised his claims about trial counsel on appeal and, therefore, the trial court could not grant relief on the issues related to the 1995 similar acts evidence pursuant to Michigan Court Rule 6.508(D). To the extent that Petitioner's claims may be procedurally defaulted as a result of the trial court's reference to Petitioner's failure to raise his claims on direct appeal, Respondent waived the defense by asserting that Petitioner's claims are not procedurally defaulted. *See Flood v. Phillips*, 90 F. App'x 108, 114 (6th Cir. 2004) (explaining that the State was required to assert procedural default as an affirmative defense in its responsive pleading and that it waived the defense when it failed to do so).

2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."

*Id.* at 788 (internal and end citations omitted).

**1. The Alleged Failure to Discover, Investigate, and Develop Impeachment Evidence**
          (Claims I.A. and III)

As noted above, Petitioner's wife testified at trial that, in 1995 when the complainant was seven years old, Petitioner informed her that the complainant had touched his penis and needed counseling. Although the trial court granted the prosecutor's request to admit the evidence,[3] Petitioner contends that his trial attorney should have attempted to rebut Mrs. Bodrie's testimony about the 1995 incidents by establishing that he did not intend to do anything illegal or wrong in 1995.

Contrary to Petitioner's claim, defense counsel did object and attempt to rebut Mrs.

---

[3] Before trial, the prosecutor filed a motion *in limine* to admit the evidence. Petitioner's attorney at the time attempted to prevent the prosecutor from introducing the evidence on the ground that there was an insufficient nexus between the prior conduct and the charged conduct. The prosecutor, however, maintained that the evidence was admissible to show intent, scheme, system of doing an act, and lack of mistake or accident, and the trial court held that the evidence was admissible under Michigan Rule of Evidence 404(B). (Evidentiary Hr'g Tr. Nov. 4, 2002, 3-7.)

Petitioner had a different attorney at trial. The trial attorney also objected to the evidence, but the trial court overruled the objection on the basis of the court's prior ruling. (Trial Tr. vol. I, Oct. 7, 2003, 96-97, 100-101.)

On direct appeal, the Michigan Court of Appeals agreed with the trial court that evidence of sexual contact between Petitioner and his stepdaughter in 1995 was admissible. The Court of Appeals noted that there were several similarities between the 1995 and 2002 incidents, including the identity of the alleged victim, the time of the day when the contact occurred, the type of contact, and the fact that the complainant's mother was not at home when the contact occurred. The Court of Appeals concluded that these similarities were sufficient to show that Petitioner used a common scheme, plan, or system to assault his stepdaughter and, therefore, the evidence was admissible.

Bodrie's comments about the 1995 incidents.  As explained in footnote three, defense counsel lodged a formal objection to Mrs. Bodrie's testimony when the prosecutor raised the issue at trial.  Although the trial court denied the objection, the court treated the objection as a continuing objection.  (Trial Tr. vol. I, Oct. 7, 2003, 96-97.)  Defense counsel raised another objection to the testimony a short time later (*id*. at 100), and, on cross-examination of Mrs. Bodrie, defense counsel elicited testimony that the criminal charges against Petitioner in 1995 were dismissed at the preliminary examination at Mrs. Bodrie's request and on the prosecutor's recommendation. (*Id*. at 113-15).

The issue arose again during Petitioner's testimony.   When the prosecutor asked Petitioner whether there were two separate incidents of sexual contact between the complainant and him in 1995, defense counsel objected on the grounds that those charges were dismissed and that there was no sexual contact.  (Trial Tr. vol. II, Oct. 8, 2003, 95.)

Petitioner contends that defense counsel should have discovered and developed additional  impeachment evidence to undermine his wife's testimony about the incidents. According to Petitioner, trial counsel should have established that:  (1) the complainant made unsubstantiated claims about her brother being sexually abusive; (2) the social worker who investigated the 1995 incidents concluded that Petitioner was telling the truth about the 1995 incidents; and (3) the complainant came from a highly dysfunctional family, a fact which could have led the jury to find it plausible that the complainant engaged in sex play with him at the age of seven.

Although defense counsel failed to elicit testimony that a protective services worker apparently did not think Petitioner sexually molested the complainant in 1995, *see* Petitioner's

14

Attachment N (Children's Protective Services Investigative Summary), page 3, ¶ 3, defense counsel did elicit testimony that Mrs. Bodrie came from an abusive family. Counsel was prevented from asking any more questions about the family's history when the trial court sustained the prosecutor's objection to the relevance of the question. (Trial Tr. vol. I, Oct 7, 2003, 115-16.)

As for whether the complainant made unsubstantiated claims of sexual abuse by her brother, an exhibit to the habeas petition indicates that the complainant informed her therapist that her brother had been coming in her room at night and touching her. *See* Petitioner's Attachment M (List Psychological Services psychological evaluation of the complainant), p. 2, ¶ 3. Although the complainant initially denied being touched by her brother when evaluated by List Psychological Services, she shrugged her shoulders and did not respond when asked a second time. (*Id*., page 4, ¶ 2.) Mrs. Bodrie, moreover, suspected that the complainant's brother was inappropriately touching both the complainant and the complainant's sister. *See* Petitioner's Attachment N, pages 2-3. The case against the complainant's brother was closed on the ground that the allegations were unsubstantiated, (*id*., page 4), but, if defense counsel had questioned the complainant about her brother's conduct, she might have confirmed that her brother had inappropriately touched her or her sister. And the prosecutor could have brought out the fact that both Petitioner and his wife at one time suspected that the complainant's brother had been sexually abusing the complainant. *See* Petitioner's Attachment M, page 2, ¶ 3.)

Even if defense counsel's performance was deficient, the deficient performance did not prejudice the defense because Petitioner personally rebutted his wife's testimony about the 1995 incidents. He testified on cross-examination by the prosecutor that the complainant's initial

15

contact with his genitals in 1995 occurred as she was shifting in the chair.  He made it appear as though the sexual contact was accidental.  Regarding the complainant's subsequent touching of his penis on the same night, Petitioner stated that he had been sleeping and was awakened to find the complainant touching him.  He insinuated that he was completely innocent of any wrongdoing for this second incident of touching because the complainant had initiated the contact.  (Trial Tr. vol. II, Oct. 8, 2003, 95-101.)  Petitioner's own testimony served to rebut Mrs. Bodrie's testimony about the 1995 incidents.

Furthermore, the trial court charged the jurors to be very careful about how they viewed evidence that Petitioner had engaged in improper sexual conduct for which he was not on trial.  The court stated that, if the jurors believed the evidence, they could consider it only for the limited purpose of deciding whether testimony about the charged acts was believable.  The court instructed the jurors not to consider the evidence for any other purpose and not to conclude that it proved Petitioner was a bad person or likely to commit a crime.  The court also charged the jurors not to convict Petitioner simply because they thought he was guilty of other bad conduct.  (*Id*. at 179.)

Given the trial court's jury instructions, defense counsel's objections, Petitioner's testimony, and the fact that the complainant's allegations about her brother were not entirely unsubstantiated, it is unlikely that additional impeachment evidence regarding the 1995 incidents would have made a difference in the outcome of the trial.  Petitioner therefore has no right to habeas corpus relief on the basis of his claim about trial counsel's alleged failure to discover, investigate, and produce evidence to impeach Mrs. Bodrie's testimony about the 1995 incidents.

**2.  The Alleged Failure to Discover and Develop Support the Asserted Defense**
(Claim I.B.)

16

In his opening statement, defense counsel explained to the jury that, while Mrs. Bodie was hospitalized in 2002, Petitioner informed the complainant and his biological daughter that he intended to divorce his wife and seek custody of his biological daughter. Defense counsel insinuated that Mrs. Bodie was motivated to report Petitioner to the state police for sexual abuse after she learned from her daughters that Petitioner wanted to divorce her. (Trial Tr. vol. I, Oct. 7, 2003, 85-86.)

Petitioner claims that defense counsel subsequently failed to offer a plausible explanation as to why the complainant would manufacture her allegations or why Petitioner's threat of divorce would prompt Mrs. Bodie to go to the state police. According to Petitioner, defense counsel should have demonstrated to the jury that Mrs. Bodie encouraged the complainant to falsify her allegations so that Petitioner would be convicted and she could take custody of Petitioner's biological daughter without any challenge from Petitioner.

The record reveals that defense counsel made several attempts to offer a motive for the complainant's allegations against him. Defense counsel asked Mrs. Bodie on cross-examination whether the complainant had informed her that Petitioner was seeking custody of his biological daughter. Mrs. Bodie responded that she did learn from her daughters that Petitioner was threatening to get a divorce if she did not get rid of her horses. (*Id*. at 111.) At a subsequent point in the trial, defense counsel argued that the case was based on a custody issue in the divorce case, which was unresolved at the time and had been pending since August of 2002. (*Id*. at 129.)

Defense counsel also attempted to develop the defense theory on direct examination of Petitioner. Defense counsel asked Petitioner whether he had informed the state trooper who, in

17

his opinion, made the allegations against him.  Petitioner responded that he had suspected his wife and her mother because he and his wife were going through a divorce and he was planning to seek custody of his biological daughter.  (Trial Tr., vol. II, Oct. 8, 2003, 71.)  Defense counsel subsequently asked Petitioner why the complainant might be falsifying her allegations about him.  This attempt to develop the defense theory was thwarted by the prosecutor's objection to the question on the grounds that it was irrelevant and that Petitioner would not  know the complainant's state of mind.  The trial court sustained the objection.  (*Id*. at 80-81.)

During closing arguments, defense counsel maintained that Petitioner was innocent, that the complainant appeared to be testifying from a script, and that the complainant's grandmother had pressured the complainant into making her allegations after ten minutes of coaching. Defense counsel argued that they were actually trying a divorce case and a custody issue.  He stated that Petitioner was on trial because Mrs. Bodrie wanted to punish him for not loving her or for not wanting to be married to her and because he wanted custody of their daughter.  Defense counsel concluded his argument by stating that the complainant had a coached transcript and a vindictive mother and grandmother who were trying to get rid of Petitioner.  (*Id*. at 138, 142, 145-56, 149-53.)

The Court concludes that defense counsel's attempts to establish the defense theory were adequate.  The jury had enough information from which to evaluate the defense theory that the complainant and Mrs. Bodrie manufactured the allegations.

### 3.  The Failure to Object to the Prosecutor's Closing Argument
### (Claims I.C. and III)

Petitioner contends that the prosecutor misrepresented the evidence during closing arguments and that defense counsel was ineffective for failing to object to the arguments.  The

18

disputed argument concerned the 1995 incidents during which the complainant supposedly

touched Petitioner's penis.  The prosecutor said:

> You also heard evidence about what happened back in 1995 between the victim who at that time was seven, and the adult defendant.
>
> And as you think about the evidence, all of the evidence, I ask you to do that.  Look at it in its totality . . . .
>
> . . . .
>
> As you think about things, ask yourself, have you ever heard a more ridiculous story than a seven year old attacking an adult, sexually attacking an adult in the fashion that the evidence came in during this trial?
>
> The defendant's version of events.  Yes, she came after me.  It was that little seven year old girl.  You heard the circumstance, you heard her explain, you heard what happened previously.

(*Id*. at 125-26.)  The prosecutor also compared the complainant's current allegations about

Petitioner to what happened in 1995, describing the two incidents as "strangely similar."  (*Id*. at

127.)  He maintained that Petitioner "dodged the bullet" in 1995.  (*Id*. at 137, 161.)

Petitioner contends that defense counsel should have objected to these comments because

the comments were an inaccurate description of his testimony and incorrectly suggested to the

jury that he intended to do something wrong in 1995 and was making an excuse for what

happened then.  Petitioner also claims that there were no similarities between the 1995 and 2002

incidents and that he neither testified, nor implied, that he was sexually attacked in 1995.

"Interruptions of arguments, either by opposing counsel or the presiding judge, are

matters to be approached cautiously," *United States v. Young*, 470 U.S. 1, 13 (1985), and

although defense counsel did not make a formal objection to the prosecutor's argument, he did

respond to it.  He said that the 1995 case against Petitioner was dismissed and that Petitioner did

19

not dodge the bullet or "do something this time because he got away with it the last time, because nothing happened that time or this time."  (Trial Tr. vol. II, Oct. 7, 2003, 146.)

Furthermore, although prosecutors may not misrepresent the evidence or assert facts never admitted in evidence, *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), they "may argue reasonable inferences from the evidence" during closing arguments.  *Amos v. Renico*, 683 F.3d 720, 730 (6th Cir. 2012) (citing *United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir. 2011)), *cert. denied*, __ U.S. __, 133 S. Ct. 664 (2012).  The disputed comments in this case were based on evidence that Petitioner was charged with sexually abusing the complainant in 1995 and that the case was dismissed simply because the complainant was emotionally incapable of testifying.  The two incidents were similar in that they involved the same victim, the same kind of conduct, and a situation where the complainant's mother was not home.  The prosecutor reasonably inferred from the evidence that Petitioner's version of the 1995 incidents was not believable and that Petitioner "dodged the bullet" in 1995.  Therefore, trial counsel's failure to object to the prosecutor's remarks did not amount to deficient performance.

Even if counsel's performance was deficient, the trial court charged the jurors not to let sympathy or prejudice influence their decision.  The court also stated that the attorney's statements, questions, and arguments were not evidence and that the jurors should decide the facts and base their verdict on the admissible evidence.  (Trial Tr. vol. II, Oct. 8, 2003, 167, 169.)  Jurors are presumed to follow their instructions, *Richardson v. Marsh*, 481 U.S. 200,  211 (1987); *Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005) (citing *Washington v. Hofbauer*, 228 F.3d at 706), and the generalized instructions in this case served to eliminate any prejudice caused by the prosecutor's remarks.  Furthermore, an objection likely would have resulted in a

cautionary jury instruction similar to the one given during the trial court's charge to the jury. Therefore, defense counsel's failure to object to the prosecutor's remarks did not prejudice the defense.

### 4. The Alleged Failure to Investigate and Locate a Defense Expert
   (Claim I.D.)

Petitioner's final argument about trial counsel alleges that counsel was ineffective for failing to locate and produce an expert defense witness. Petitioner contends that trial counsel primed the jury in his opening statement to believe that the complainant manufactured her allegations, but he failed to offer any evidence as to why the complainant would manufacture her allegations. According to Petitioner, an expert witness could have helped the jury to understand how the complainant's memory of certain sexual matters was confabulation to the current situation and brought on by contact with her grandmother, who prodded her on the subject of sexual touching. Petitioner contends that the jury needed to hear from an expert witness that the complainant had a propensity to manufacture allegations and would lie about something serious.

There is no evidence in the record that the complainant confused the 2002 incidents with her memory of other incidents involving sexual matters. Mrs. Bodrie, moreover, testified that, although the complainant was a teenager and probably lied on occasion, she thought the complainant generally was truthful about serious things. She did not think that the complainant had been pressured to disclose something that may not have happened. (Trial Tr. vol. I, Oct. 7, 2003, 106-07).

Joyce Rahn also thought the complainant was truthful. She testified that she did not coach the complainant, tell the complainant how to describe what happened, or try to make the complainant say something that she would not normally say. (*Id*. at 206, 209, 220-22.)

21

To counter this evidence, Petitioner testified that he thought the complainant was being untruthful (Trial Tr. vol. II, Oct. 8, 2003, 80), and Barbara Hatfield insinuated that Joyce Rahn had pressured the complainant into making the allegations against Petitioner (*id*. at 31-34).  In addition, defense counsel argued that the complainant's testimony was scripted and unclear as to the details of what happened.

There was enough evidence from which the jury could evaluate the witnesses' credibility and determine whether the complainant was telling the truth or falsifying her allegations.  Consequently, trial counsel was not ineffective for failing to locate and produce an expert witness in an attempt to show that the complainant was falsifying her allegations.  At most, an expert witness could only have speculated about whether the complainant was being truthful.

### 5.  Summary

For all the reasons given above, the Court finds that trial counsel performed adequately and that any deficiencies in counsel's performance did not prejudice the defense.  Therefore, Petitioner has no right to relief on the basis of his claims about trial counsel.

## B.  Appellate Counsel
(Claim IV)

Petitioner alleges next that his appellate attorneys were ineffective for failing to include viable issues on appeal, such as trial counsel's ineffectiveness.  The trial court concluded in its order denying Petitioner's motion for post-conviction relief that appellate counsel's decision to raise only an issue about the 1995 similar acts evidence did not amount to ineffective assistance.

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance."  *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011) (citing *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004)), *cert. denied*, __ U.S. __, 133 S. Ct.

22

107 (2012).  But to demonstrate that appellate counsel was ineffective, Petitioner must show (1) that his attorneys were objectively unreasonable in failing to raise other issues on appeal and (2) a reasonable probability that he would have prevailed on appeal were it not for his attorney's failure to raise the issues on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. at 687-91, 694); *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010).

This Court determined above that trial counsel performed adequately and that any deficiencies in counsel's performance did not prejudice the defense.  The Court's inquiry, therefore, "is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."  *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001); *see also Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) ("Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'") (quoting *Greer v. Mitchell*, 264 F.3d at 676).

## C.  The Trial Court's Denial of Petitioner's Motion for Relief from Judgment
(Claims II, VI, and VII)

The second, sixth, and seventh habeas claims pertain to the trial court's decisions on Petitioner's post-conviction motions.  The second claim alleges that the trial court erred by denying Petitioner's motion for relief from judgment on the ground that Petitioner failed to allege "cause" for not raising his claims on direct appeal.  Petitioner contends that his claims were properly before the court and that he met the "cause and prejudice" standards for relief by showing that his appellate attorneys were the reason for his failure to raise his claims on direct appeal.

The sixth habeas claim alleges that the trial court erred by denying Petitioner's motion

23

for relief from judgment before receiving certain supplemental information, which the court needed to make a decision on the motion. Petitioner contends that he placed the trial court on notice that the supplemental information would be forthcoming, but the court decided his motion without waiting for the supplemental materials and later denied reconsideration after the supplemental materials were submitted.

Petitioner makes similar allegations in his seventh habeas claim. He also alleges that the trial court abused its discretion by assigning one of his post-conviction motions to a visiting judge who knew nothing about his case and who summarily denied his motion without providing any reasons for the denial.

These claims (II, VI, and VII) are not a basis for habeas relief because Petitioner merely disagrees with the trial court's interpretation of the Michigan Court Rules. He is alleging violations of state law, which are not cognizable claims on habeas corpus review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68 (citing 28 U.S.C. § 2241 and *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (*per curiam*)).

Petitioner does rely on one federal court decision: *Massaro v. United States*, 538 U.S. 500, 504 (2003) (holding "that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under [28 U.S.C.] § 2255, whether or not the petitioner could have raised the claim on direct appeal"). But *Massaro* "is a rule of practice for federal judges in federal criminal cases . . . ." *Hayes v. Battaglia*, 403 F.3d 935, 937 (7th Cir. 2005). It does not apply to proceedings under § 2254. *See id*.; *see also Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003) (stating that " *Massaro* is not a constitutional decision, and by its own language it did not extend

24

its rule beyond § 2255").

Furthermore, habeas relief may not be granted "for alleged deficiencies in a state's post-conviction procedures." *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002) (citing *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986)). Such claims are not cognizable on federal habeas review. *Id.* Petitioner therefore has no right to relief on the basis of his second, sixth, and seventh claims.

**D. Evidentiary Hearing**
(Claim V)

Petitioner alleges that the Court should conduct an evidentiary hearing on his ineffective-assistance-of-counsel claims, because the state court declined to grant him a hearing on the claims. Petitioner asserts that the state court record is insufficient to expose the deficiencies in trial counsel's strategy and performance.

Petitioner sought an evidentiary hearing in state court while his case was pending on direct appeal. Because the Michigan Court of Appeals denied his motion to remand the case for an evidentiary hearing, Petitioner is not at fault for failing to develop the facts in state court. The state trial court, however, ultimately found no merit in Petitioner's claims about trial and appellate counsel. Therefore, federal habeas review "is limited to the record that was before the state court," *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1398 (2011), and this Court may not grant an evidentiary hearing.

## IV. CONCLUSION

The state court orders rejecting Petitioner's claims were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable determinations of the facts. And because the state court rulings were not "so lacking in

25

justification" as to be "beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 131 S. Ct. at 786-87, the amended petition for writ of habeas corpus is **DENIED**.

## V. CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). When, as in this case, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . ." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists could debate the Court's assessment of Petitioner's constitutional claims about trial and appellate counsel or at least conclude that the issues are adequate to deserve encouragement to proceed further. Therefore, a certificate of appealability may issue on claims I, III, and IV. The Court declines to grant a certificate of appealability on the remaining claims, because those claims allege violations of state law or do not assert a stand-alone claim for habeas relief. Petitioner nevertheless may proceed *in forma pauperis* on appeal if he chooses to appeal this decision, because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).


s/Gerald E. Rosen                    
Chief Judge, United States District Court

Dated: February 25, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or

26

counsel of record on February 25, 2013, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager